IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MICHAEL CETERA, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 03-701 |
| | ) | |
| v. | ) | |
| | ) | Magistrate Judge Caiazza[1] |
| CSX TRANSPORTATION, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

**I. MEMORANDUM OPINION**

For the reasons stated below, the Defendant's Motion for Summary Judgment (Doc. 29) will be granted.

**BACKGROUND**

1. Procedural History

Michael Cetera ("the Plaintiff") commenced this disability discrimination action against CSX Transportation, Inc. ("CSX" or "the Defendant") on May 16, 2003. *See generally* Compl. (Doc. 1). The Plaintiff generally alleges that CSX refused to hire him on the basis of a perceived heart-related disability in violation of the Americans with Disabilities Act of 1990 ("the ADA"), 42 U.S.C. Section 12101, *et seq.*, and the Pennsylvania Human Relations Act ("the PHRA"), 43 Pa. Cons. Stat. Ann. Section 951,

---

[1] On March 2, 2004, the District Court Judge Arthur J. Schwab referred this case to the undersigned, based on the consent of the parties, to conduct "all proceedings and order the entry of judgment in accordance with 28 U.S.C. § 636(c) and Fed.R.Civ.P. 73 . . . ." *See* Consent to the Exercise of Jurisdiction by a United States Magistrate Judge and Order of Reference (Doc. 25).

*et seq.*  *See generally* Am. Compl. (Doc. 12).

On February 22, 2005, the Defendant filed a Motion for Summary Judgment (Doc. 29; "the Defendant's Motion").  The briefing has come to a close and the Defendant's Motion is now ripe for adjudication.

2.  Facts

On July 20, 2000, the Plaintiff responded to an advertisement in a local newspaper by attending a meeting at the Hampton Inn in Uniontown, Pennsylvania.  *See* Dep. of Michael Theodore Cetera (attached as Ex. 1 to Def.'s Statement of Material Facts (Doc. 31)[2]; hereinafter cited as "Def.'s Cetera Dep.") at 23, 31; Am. Compl. ¶ 7.  The advertisement, placed by the Community College of Philadelphia ("CCP"), offered a five-week training program as a freight conductor ("the Conductor Training Program") with "[e]xcellent [c]areer [o]pportunit[ies]" and "[g]uaranteed [i]nterviews with CSX[]."  *See* CCP Advertisement (attached as Ex. 2 to Def.'s Facts).[3]

---

[2]  The Defendant's Statement of Material Facts (Doc. 31) will hereinafter be referred to as "Def.'s Facts."  The Plaintiff's Response to Defendant's Statement of Facts and Plaintiff's Statement of Additional Material Facts (Doc. 35) will hereinafter be referred to as "Pl.'s Facts."

[3]  CCP had entered into an "informal relationship" with CSX in 1998 to "recruit, select, and train people to become freight conductors at CSX."  *See* Dep. of Bradshaw Kinsey (attached as Ex. 2 to Pl.'s Facts; hereinafter cited as "Pl.'s Kinsey Dep.") at 9.  Through this relationship, CCP "was responsible for recruiting potential students for the Conductor Training [P]rogram" and CSX agreed "to hire as many qualified graduates from [the] program as possible, consistent with projected job openings."  *See* Aff. of Lenora Denise Purdie (attached as Ex. 3 to Def.'s Facts; hereinafter cited as "Purdie Aff.") ¶ 3; Railroad Training Information Packet (attached as Ex. 5 to Def.'s Facts; hereinafter cited as "Training Packet") at 6.  CCP provided the training at its campus in Philadelphia; however, the substance of the training "[wa]s

At the meeting, the Plaintiff filled out various forms, completed several tests, and was interviewed by an agent of CCP, Roy Walker ("Walker"). *See* Def.'s Cetera Dep. at 36. During the interview, Walker purportedly told the Plaintiff that if he passed the training program at CCP, he would be hired as a conductor with CSX. *See id.; see also generally* Dep. of Jerry Wayne Merritt, Jr. (attached as Ex. 1 to Pl.'s Facts; hereinafter cited as "Merritt Dep.") at 8 ("They told us that [the training program] was for CSX [and] if you get in this course and pass it, you have a job with CSX.").[4]

Walker contacted the Plaintiff two weeks later and explained that based on the medical information provided in his application he would need to have his medical qualifications reviewed by CSX's medical staff. *See* Def.'s Cetera Dep. at 38. Walker further instructed the Plaintiff to have his cardiologist, Dr. Roy J. Landfair, M.D. ("Dr. Landfair"), review the duties associated with the job of railroad conductor and submit a report confirming that the Plaintiff was physically capable of

---

designed by CSX[], . . . use[d] CSX[] instructional materials and rulebooks, . . . [was] conduct[ed] [by CSX instructors, and] . . . involved [CSX] in the assignment and supervision of field training." *See* Training Packet at 2, 6.

[4]  The Defendant's submissions indicate, however, that CSX never explicitly authorized CCP or its agents to guarantee a job with CSX to the Conductor Training Program applicants. *See* Purdie Aff. ¶ 9; *see also* Dep. of Bradshaw Kinsey (attached as Ex. 4 to Def.'s Facts; hereinafter cited as "Def.'s Kinsey Dep.") at 113 (noting that he "always emphasized the fact that [CCP] w[as] not guaranteeing a job with CSX . . . [but was] simply training people and that was it.").

performing them.  *See id.* at 39-40.

In a letter dated August 22, 2000, Dr. Landfair explained that the Plaintiff "had a congenital abnormality of the aortic valve[;]" however, he "underwent surgical opening on the valve in 1990 and has done well since."  *See* Letter from Dr. Landfair to Roy Walker dated 8/22/00 (attached as Ex. 4 to Pl.'s Facts) at 1. Dr. Landfair opined – based on an evaluation that included a recent echocardiogram – that the Plaintiff "would be able to perform the duties and responsibilities of a conductor."  *See id.* at 2.

Walker purportedly forwarded the letter to CSX's medical department "for guidance as to whether the condition could keep the [Plaintiff] from being hired."  *See* Aff. of Roy Walker Regarding Michael Cetera (attached as Ex. 5 to Pl.'s Facts; hereinafter cited as "Walker Aff.") ¶ 1 & 2.; Pl.'s Kinsey Dep. at 17 ("We decided that we ought to get the information from [the Plaintiff's] doctor regarding the [condition] . . . and submit[] [it] to CSX medical for . . . an unofficial advisory opinion."); *see also* Def.'s Cetera Dep. at 42-43 (describing same).[5]  This was ostensibly the "protocol" pertaining to any prospective student with a "questionable medical condition."  *See* Walker Aff.

---

[5]  The Defendant maintains, however, that its medical department did not issue opinions as to whether an applicant to the training program would be physically or medically capable of performing the duties of a railroad conductor until after he or she was given an offer with CSX.  *See* Dep. of Thomas George Cook (attached as Ex. 9 to Def.'s Facts) at 51; Aff. of Marcia Smith (attached as Ex. 8 to Def.'s Facts) ¶¶ 4-10.

4

¶ 2.

A few weeks later, Walker allegedly contacted the Plaintiff and informed him that his application had been approved by CSX's medical department and that he would be accepted into CCP's training program.  *See* Def.'s Cetera Dep. at 43-44.  On February 13, 2002, CPP sent a letter to the Plaintiff notifying him of his enrollment in the Conductor Training Program.  *See* Letter from Dimitria Karamanides to Michael Cetera dated 2/13/02 (attached as Ex. 6 to Pl.'s Facts) at 1.  The letter further indicated that "[u]pon successful completion of the five-week course in Philadelphia and one week of field training . . . [the Plaintiff was] scheduled to report to work in Connellsville, P[ennsylvani]a."  *See id.*

The Plaintiff attended the first day of class on March 18, 2002.  *See* Def.'s Cetera Dep. at 62.  The class was taught by at least two instructors.  *See* Def.'s Cetera Dep. at 62-63; Merritt Dep. at 13.  A third individual, Charles Allen ("Allen"), was present; however, the parties dispute whether he was teaching or merely observing the class.  *Compare* Def.'s Facts ¶ 31 *with* Def.'s Cetera Dep. at 62-63 (identifying three instructors) *and* Merritt Dep. at 13 (stating that Allen was merely observer).  All three individuals identified themselves as employees of CSX.  *See*

Def.'s Cetera Dep. at 64; Merritt Dep. at 14.[6]

During the first few hours of class, Allen asked the students to reveal any major medical conditions. *See* Dep. of Michael Theodore Cetera (attached as Ex. 3 to Pl.'s Facts; hereinafter cited as "Pl.'s Cetera Dep.") at 66. The Plaintiff indicated that he had stenosis of the aorta but that his condition had been pre-approved by CSX. *See id.* at 67-68. Allen expressed doubt as to the whether CSX would employ the Plaintiff in light of his condition and stated that his situation "thr[ew] up a red flag." *Compare id. with* Def.'s Kinsey Dep. at 29 ("Allen told him in front of [the class] that he would . . . never get a job with CSX because of [his] medical condition.").

At some point following this exchange, Allen notified Kinsey – the Dean of CCP and coordinator of the Conductor Training Program – that he had "two students in the class who CSX will never hire." *See* Def.'s Kinsey Dep. at 29.

A few hours into class on the second day, Allen excused the Plaintiff and asked him to report to Kinsey's office. *See* Pl.'s Cetera Dep. at 72. At that time, Kinsey purportedly told the Plaintiff that a mistake had been made in previously approving his application and that he would not meet the standards set forth in CSX's newly-issued medical guidelines. *See* Pl.'s Cetera

---

[6] Bradshaw Kinsey ("Kinsey") noted in his deposition testimony, however, that one of the three – identified only as Mr. Major – had not actually been employed by CSX. *See* Pl.'s Kinsey Dep. at 27.

Dep. at 73-74. The parties dispute who attended this meeting, but the Plaintiff claims that Allen was present and confirmed Kinsey's opinion. *Compare* Pl.'s Cetera Dep. at 72, 76-77 (reporting that Allen was present and that the two were "in agreement that if [the Plaintiff] stayed in the course, [he] was going to be wasting his money . . . [because] when the physical came up . . . [he was] not going to pass it") *and id.* at 79 (noting that Allen said he was "95 percent positive" that the Plaintiff would not pass the physical) *with* Def.'s Kinsey Dep. at 30 (stating that Allen was not present at the meeting).

Kinsey gave the Plaintiff the option of remaining in the class despite the fact that "his chances of receiving medical approval were less than 50/50" or leaving the program with a full refund. *See* Response to Questions Raised by External Complaint (PHRC) (attached as Ex. 7 to Pl.'s Kinsey Dep.) at 1-2; *see also* Pl.'s Cetera Dep. at 76-77. The Plaintiff notified Kinsey at that time that he would accept the refund. *See* Pl.'s Cetera Dep. at 80-81.[7]

Following this meeting, Allen and Kinsey purportedly returned to class to explain what had transpired – namely, that the Plaintiff "was disqualified" because of his heart condition and that "CSX guidelines didn't allow [for] . . . [candidates

---

[7] Kinsey maintains, however, that the Plaintiff did not respond to the offer at the time, but sent a letter several weeks later itemizing his expenses. *See* Def.'s Kinsey Dep. at 42.

with] heart disease [or other] major medical issues."  *See* Merritt Dep. at 15-16.

The Plaintiff left Philadelphia on March 19, 2002 and was reimbursed for the classes at some point thereafter.  *See* Pl.'s Cetera Dep. at 81.

**ANALYSIS**

To prevail on this disability claim, a plaintiff must initially prove that: "(1) he is a disabled person within the meaning of the ADA; (2) he is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) he has suffered an otherwise adverse employment decision as a result of discrimination."  *See, e.g.,* Williams v. Philadelphia Hous. Auth. Police Dep't, 380 F.3d 751, 761 (3d Cir. 2004) (internal citations and quotations omitted).  In moving for summary judgment, the Defendant argues that Plaintiff has failed to establish the first and third element of his *prima facie* case.  *See generally* Mem. of Law in Supp. of Def.'s Mot. for Summ. J. (Doc. 30; hereinafter cited as "Def.'s Br.") at 3-12.

The Defendant's contention that the Plaintiff did not suffer an adverse employment decision because he did not file a formal job application with CSX lacks merit.  *See* Def.'s Br. at 10-12.  The failure to formally apply for a job opening is not fatal to a claim of discriminatory hiring where, as here, a plaintiff has

"made every reasonable attempt to convey his interest in the job to the employer." *See, e.g.,* McCutchen v. Sunoco, Inc., 2002 WL 1896586, *5 (E.D. Pa. Aug. 16, 2002) (quoting EEOC v. Metal Serv. Co, 892 F.2d 341, 347 (3d Cir. 1990)).  Moreover, the Plaintiff submitted an application and interviewed with CCP, an entity whose undisputed purpose was to "recruit, select, and train people to become freight conductors at CSX."  *See* Pl.'s Kinsey Dep. at 9; *see also* Purdie Aff. ¶ 3.  The Plaintiff then took efforts to obtain and submit additional materials relating to his medical condition upon Walker's request.  *See* discussion *supra*.  Thereafter, the Plaintiff moved to Philadelphia to be trained and with the expectation that he was scheduled to report to work in Connellsville, Pennsylvania.  *See id*.

These "attempts to convey his interest" in employment with CSX are sufficient under the law.  *See generally* Metal Serv. Co., 892 F.2d at 351-52 ("[F]ederal courts simply cannot make the *prima facie* case unduly burdensome[:] . . . [t]his is especially true for the application requirement.") (citations omitted).  The fact that the Plaintiff did not later apply for a job directly with CSX after being told by Kinsey and Allen his chances of passing CSX's physical were minimal do not preclude the Plaintiff from recovery.  *See* Newark Branch, N.A.A.C.P. v. Town of Harrison, N.J., 907 F.2d 1408, 1414 (3d Cir. 1990) ("When a person's desire for a job is not translated into a formal

9

application solely because of his unwillingness to engage in a futile gesture he is as much a victim of discrimination as is he who goes through the motions of submitting an application.") (citations and internal quotations omitted).[8]

What remains, therefore, is whether the Plaintiff has put forth sufficient evidence to establish that he is a "disabled person" within the meaning of the ADA.  *See* discussion *supra*. The Plaintiff does not allege an actual disability in this instance; rather, he alleges that "the Defendant regarded him as being substantially limited in a major life activity of working." *See* Pl.'s Mem. of Law in Opp'n to Def.'s Mot. for Summ. J. (Doc. 34) at 14; *see also* Van Houten v. Principi, 106 Fed.Appx. 134, 136 (3d Cir. Aug. 6, 2004) (noting that a disability under the ADA can be: "(1) [a] physical or mental impairment that substantially limits one or more of the major life activities . . . [;] (2) [a] record of such impairment; or (3) being regarded as having such an impairment") (citations and internal quotations omitted; emphasis added).

The Defendant's challenge with respect to the Plaintiff's claimed disability is two-fold: first, it argues that because there was no agency relationship between CSX and Kinsey and/or

---

[8]  Parenthetically, it can be inferred from the record that had the Plaintiff stayed in the class, he would have filled out a formal CSX application during the first week of class.  *See* Def.'s Kinsey Dep. at 22 ("We generally t[ook] the first week [of class], a couple of hours each day . . . to go over [CSX's] application line by line to make sure people are filling it out because then we ha[d] to overnight it to CSX.").

Allen, the Plaintiff has failed to establish that CSX formed *any* belief whatsoever as to the Plaintiff's physical condition; second, assuming that it did, the Plaintiff has failed to show that the Defendant regarded the condition of his aortic valve to be "substantially limiting" in the major life activity of working.  *See* Def.'s Br. at 5-10.

The court finds the Defendant's first argument unpersuasive. Both Kinsey and Allen participated in the decision-making process that would ultimately lead to employment at CSX; accordingly, their statements and conduct can properly be imputed to the Defendant.  *See* discussion *supra*; *see also* Levendos v. Stern Entm't, Inc., 909 F.2d 747, 752 (3d Cir. 1990) (holding that the actions of an employer's agent – *i.e.*, a person who "participated in the decision-making process that forms the basis of the discrimination" – may be imputed to the employer) (citations omitted); Ebert v. Office of Info. Sys., 1998 WL 324923, *8 (D. Del. June 12, 1998) ("[A] person with the power to . . . influence hiring and firing decisions[] is an . . . agent of the employer . . . [whose] acts may be imputed to the employer . . . .") (citations omitted).

The Defendant's second argument is successful, however, and proves fatal to the Plaintiff's case.  To prevail on a "regarded as" theory of disability discrimination based on the defendant's alleged perception of the plaintiff as limited in the life activity of "working," a plaintiff must demonstrate that

11

"working" encompassed "either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skill or abilities."  *See* Parker v. Port Auth. of Allegheny County, 90 Fed.Appx. 600, 603 (3d Cir. Jan. 21, 2004) (citations and internal quotations omitted).

In this instance, the Plaintiff has failed to show that CSX "regarded [him] as precluded from more than a particular job" – that is, the job of railroad conductor.  *See id.* (citation and internal quotations omitted); *see also* Sutton v. United Air Lines, Inc., 527 U.S. 471, 492 (1999) (noting that a plaintiff must show he was regarded as "precluded from more than one type of job, a specialized job, or a particular job of choice").  If there is any evidence suggesting that CSX or its agents perceived the Plaintiff's "disability" as disqualifying him from any position other than railroad conductor, counsel has failed to cite it.  *Accord* Little v. S.E. Pa. Transp. Auth., 2003 WL 1793528 (E.D. Pa Apr. 3, 2003) ("Disqualification from one position does not support the allegation that [the defendant] regarded [the] [p]laintiff as having a substantially limiting impairment.") (citation omitted); Bullock v. Balis & Co., 2001 WL 253857, *6 (E.D. Pa. Mar. 14, 2001) ("Merely being regarded as unable to perform the specific job from which one has been [excluded] does not rise to the level of a disability under the ADA.") (citation omitted).

Without such evidence, no reasonable jury could conclude

that CSX regarded the Plaintiff as significantly restricted in his ability to perform either a class of jobs or a broad range of jobs. *See, e.g., id.* at * 6 ("In order to survive . . . [a] [m]otion for [s]ummary [j]udgment, [a plaintiff] must have presented a genuine issue of material fact regarding whether [the defendant] regarded him as unable to hold either a class of jobs or a broad range of jobs in various classes."); *cf.* Merit v. S.E. Pa. Transit Auth., 315 F.Supp.2d 689, 700-701 (E.D. Pa. 2003) (noting a plaintiff's duty to present "some affirmative evidence" as to the class of jobs he or she is precluded from performing).[9]

Accordingly, as the Plaintiff has failed to establish this element of his *prima facie* case, summary judgment must be granted in favor the Defendant.

For the reasons stated above, the court enters the following:

## II. ORDER

AND NOW, on this 6th day of July, 2005, IT IS HEREBY ORDERED that: the Defendant's Motion for Summary Judgment (Doc. 29) is

---

[9] The Plaintiff's unsupported speculation in its brief as to the possible similarities between the nature of the conductor job and other unidentified jobs is not sufficient to withstand summary judgment. *Compare* Pl.'s Br. at 17 (arguing, for example, that "lifting and carrying a knuckle or train end is no different from lifting and carrying a bag of cement . . .") *with* Iverson v. City of Philadelphia, 2005 WL 1527724, *2 (E.D. Pa. June 27, 2005) (a "non-moving party cannot rely on unsupported assertions, conclusory allegations, or mere suspicions in attempting to survive a summary judgment motion") (citations and internal quotations omitted).

GRANTED.

*Francis X. Caiazza*
Francis X. Caiazza
U.S. Magistrate Judge

cc:

Neal A. Sanders, Esq.
Law Offices of Neal A. Sanders
1924 North Main Street Ext.
Butler, PA 16001

Thomas H. May, Esq.
Dickie, McCamey & Chilcote, P.C.
Two PPG Place, Suite 400
Pittsburgh, PA 15222-5402